**LANCER INDUSTRIES, INC.**

v.

**AMERICAN INSURANCE COMPANY et al.**

Civ. A. Nos. 8098, 8099.

United States District Court
W. D. Louisiana,
Shreveport Division.

Sept. 25, 1961.

T. Haller Jackson, Jr., Tucker, Bronson & Martin, Shreveport, La., for plaintiff.

Richard H. Switzer, Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

On July 6, 1960, a fibre glass swimming pool manufacturing plant, owned by the Town of Coushatta, Louisiana, and leased and operated by Lancer Industries, Inc., was partially destroyed by fire. After unsuccessful attempts to obtain indemnity from more than a dozen of its fire insurers, Lancer filed three separate suits on November 29, 1960, against three groups of insurers, in the Tenth Judicial District Court for Red River Parish, Louisiana.

One of the suits, an action for recovery of inventory losses, has been settled. The remaining two suits, however, which bear docket numbers 8098 and 8099 in this Court, are still pending. The first numbered is for indemnity under various policies insuring plaintiff against the risk of loss of the use and occupancy of the premises at Coushatta, Louisiana, and the other is for indemnity under various policies insuring plaintiff against the risk of damage to or loss of machinery, equipment, tools, molds, and other business property.

In both actions, plaintiff alleged that it is a Florida corporation with its principal place of business in Mineola, New York, and that it is authorized to do business in the State of Louisiana. In suit number 8098 plaintiff alleged that five of the defendant-insurers are incorporated in New York, and in suit number 8099 it is alleged that four of the defendant-insurers are incorporated in New York.

On December 16, 1960, the defendants in both cases removed them to this Court on the ground that the plaintiff maintains its principal place of business in Coushatta, Louisiana, not Mineola, New York. They contend, therefore, that under 28 U.S.C. § 1332(c), there is diversity of citizenship between Lancer and all of the defendants in both suits so as to vest this Court with jurisdiction. Defendants also have joined in motions to transfer the actions, from this Court to the United States District Court for the Southern District of New York, as a more convenient forum. For its part Lancer timely moved to remand both actions to the State Court on the ground that there is not complete diversity of citizenship present, since some of the defendants in each action are corporate citizens of New York, where Lancer has its "principal place of business," and hence its citizenship.

The issues, therefore, are (1) whether plaintiff's "principal place of business," when the suits were commenced, was in New York, Louisiana, or elsewhere, within the meaning of 28 U.S.C. § 1332(c), and (2) if plaintiff's "principal place of business" is found to have been in New York, whether plaintiff has set forth "a separate and independent claim or cause of action, which would be removable if sued upon alone," against some or all of

the defendants in either of the two suits. 28 U.S.C. § 1441(c).

■ At the threshold we must determine who carries the burden of proving the required diversity of citizenship where the Court's jurisdiction has been challenged by a motion to remand. We find from the authorities that a defendant who has removed a case from a State Court has the burden of proving that the Federal Court has jurisdiction, if the allegations of the petition for removal are contested. Rick v. Hedrick, D.C.W.D.Mo. 1958, 167 F.Supp. 491; Harrisville Co. v. Home Insurance Co. et al., D.C.S.D.N. Y.1954, 129 F.Supp. 300; Welsh v. American Surety Co. of N. Y., 5 Cir., 1951, 186 F.2d 16; Mason v. Salter, D.C.W.D.La. 1950, 92 F.Supp. 627; Carson v. Dunham, 1887, 121 U.S. 421, 7 S.Ct. 1030, 30 L.Ed. 992.

■ In order for an action to be removed from a State to a Federal Court on grounds of diversity, such must have existed at the time of commencement of the suit and this determination is made, at least in part, by looking to the pleadings on the date of filing the petition for removal. Thompson v. Mobil Producing Co., D.C.Mont.1958, 163 F.Supp. 402; Gray v. Stanford Research Institute, D. C.N.D.Tex.1952, 108 F.Supp. 636; Rick v. Hedrick, D.C.W.D.Mo.1958, 167 F. Supp. 491; Pacific Gas & Electric Co. v. Fibreboard Products, Inc., D.C.N.D.Cal. 1953, 116 F.Supp. 377; State of Colorado ex rel. Land Acquisition Commission v. American Machine & Foundry Co., D.C. Colo.1956, 143 F.Supp. 703; and Greenshields v. Warren Petroleum Corp., 10 Cir., 1957, 248 F.2d 61, certiorari denied 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262.

■ Moreover, under amendments intended to restrict rather than enlarge Federal jurisdiction, all doubts resulting from defective, ambiguous and inartful pleadings, as well as for other reasons, should be resolved against Federal and in favor of State Court jurisdiction. Greenshields v. Warren Petroleum Corp., supra, Maurer v. International Typographical Union et al., D.C.E.D.Pa.1956, 139 F.

Supp. 337; Harrisville Co. v. Home Insurance Co. et al., D.C.S.D.N.Y. 1954, 129 F.Supp. 300; American Fire & Casualty Co. v. Finn, 1951, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702.

For purposes of diversity of citizenship, "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its *principal place of business*." 28 U.S.C. § 1332(c). (Emphasis added.)

In contradiction of their present position, and perhaps due to inadvertence, defendants' motions for a change of venue affirmatively allege that plaintiff's principal place of business is in New York. When these suits were commenced in the State Court, November 29, 1960, and on the date defendants removed them to this Court, December 16, 1960, plaintiff, Lancer Industries, Inc., actually maintained its administrative or executive offices in Mineola, New York.

A registration statement filed with the Securities and Exchange Commission on April 28, 1961, reveals the following facts: Lancer Industries, Inc., was organized under the laws of Florida on December 23, 1955, by persons in no way related to or associated with the present management. After its acquisition by its present stockholders, from January 2, 1958, through July, 1960, the company was primarily interested in the manufacture of fibre glass swimming pools. Pools had been produced at plants in California, Louisiana, and Florida. In January, 1960, Lancer ceased operations at its original plant in Florida and at a plant in California and concentrated production of swimming pools at the Coushatta, Louisiana, plant.

During this same period, Lancer's management embarked on a program of expansion and diversification under which it subsequently acquired numerous wholly-owned subsidiaries, including companies manufacturing structural aircraft, missile components, electronic cabinetry and components, paints, enamels, steel forgings and castings.

Because of the fire at the Coushatta plant in July of 1960, Lancer's production of swimming pools has been brought virtually to a standstill. A plant at Boonesville, Mississippi, however, commenced operations in April of 1961 under an agreement with a non-associated company to supply Lancer with its products.

Under Lancer's expansion and diversification program, it acquired Missiles Dynamics Corporation on April 26, 1960. This wholly-owned subsidiary company operates three plants in California and produces structural aircraft, components, precision sheet metal, electronic cabinetry and control boxes. Its net worth on the date of acquisition was over $320,000.

On July 12, 1960, Lancer acquired all of the outstanding stock in Olympic Paint and Varnish Company, a Delaware corporation which had a net worth of $112,600 on the date of acquisition. This wholly-owned subsidiary manufactures and sells general purpose paints, varnishes, vehicles, industrial finishes, thinners and solvents. Olympic's principal plant and offices are located in Los Angeles, California.

In August of 1960, Lancer Industries, Inc., organized a subsidiary known as Lancer Survival Corporation, a New York corporation engaged in the production of bomb blast and fall-out shelters. This subsidiary now is being operated under a license agreement with American Survival Corporation and is paying royalties for the use of patented designs. Shelters are being manufactured by the Skyline Plastics Corporation, Diagonal, Iowa, for this subsidiary and production is considered to be still in the development stage.

In September, 1960, Lancer Industries, Inc., acquired ownership of Comet Industries, Inc., a Delaware corporation which had no assets, liabilities or business upon acquisition. Lancer has changed the name of this subsidiary to Chemonics Corporation and has financed the manufacture of printed circuits and other electronics equipment. Lancer plans to issue common stock and retain controlling interest in the company. Chemonics presently operates a plant in Pasadena, California, under a $1,150 per month lease with an option to purchase adjoining properties.

Lancer acquired the assets of Federal Steel Products Corporation and Zenith Steel Casting Company in December of 1960, and on January 6, 1961, Lancer transferred the assets of Federal and Zenith to Federal Steel Corporation, a newly organized Texas corporation, wholly-owned by Lancer Industries, Inc. The combined net worth of the two corporations upon acquisition was $330,000.

Benjamin Tessler, president of Lancer Industries, Inc., testified that all policy decisions were made at the home office in New York; that all executive committee and board of directors' meetings were held either in Mineola or New York City; that as a matter of company policy, the scope of activity of all officers of subsidiary companies was limited so that no important decision was made without consultation with a representative of the parent company in New York; that no executive or sales officers were located in Louisiana and that all purchase orders for swimming pools were received in New York; that Lancer Pools Corporation, a wholly-owned subsidiary of Lancer Industries, Inc., purchased the pools from the parent company for re-sale to consumers and dealers; that most of the negotiations and all of the agreements for the acquisition of subsidiary companies were transacted in New York; and that all decisions to acquire other interests or obtain insurance for the company were made by the board of directors in New York.

Albert M. Gould, manager and foreman of the Coushatta plant, testified that, at the peak of its production, the Coushatta plant employed approximately 40 workers; that all production and financial records were forwarded to New York weekly; that he was allowed to make unauthorized purchases of less than $10 but that everything above that amount had to be authorized by the home office in New York; that payroll and operating funds

were transferred weekly to a Coushatta bank from New York; that no salesmen had ever reported to the Coushatta plant; that all credit approvals were made in New York; that he knew nothing of the finances of the company and that he had never seen an insurance policy on the plant, equipment or any business interests at the plant; and that since July 6, 1960, the date of the fire, there had been no production at the Coushatta plant.

From the foregoing evidence it is clear that executive and administrative functions of Lancer Industries, Inc., were carried on in New York, not Louisiana. Control of this highly diversified parent company was centered in New York where the executive committee and board of directors convened to make all significant policy decisions. Lancer's activities, when these suits were commenced, were spread over several States and represented a variety of interests.

Even before the fire at the Coushatta plant in July of 1960, Lancer had begun to acquire subsidiary companies and plans had been laid for acquisition of an additional swimming pool plant in Boonesville, Mississippi, which plant is presently being operated to supply Lancer with its products.

The location of executive and administrative offices from which the activities of the corporation are regulated and controlled has been held to be a significant factor in determining the corporation's principal place of business. In Scot Typewriter Co., Inc. v. Underwood Corp., D.C.S.D.N.Y.1959, 170 F.Supp. 862, 865 the Court observed:

> "* * * Moreover, it has not been uncommon in recent years for large corporations with production, selling and executive activities in one state to transfer the manufacturing operations to another state for economic advantages, such as special municipal or state tax benefits or more desirable labor markets. The circumstance that all manufacturing, or a large part of it, was relocated in a new state would not necessarily mean that a corporation's principal place of business had been transferred at the same time.

> "Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. * * *"

Other Courts have looked to the "nerve center" as the "principal place of business" of a corporation such as Lancer. See Hughes v. United Engineers & Constructors, Inc., D.C.S.D.N.Y.1959, 178 F.Supp. 895; Wear-Ever Aluminum, Inc. v. Sipos, D.C.S.D.N.Y.1960, 184 F.Supp. 364; Moesser v. Crucible Steel Co. of America, D.C.W.D.Pa.1959, 173 F.Supp. 953; Riley v. Gulf, Mobile & Ohio Railroad Co., D.C.S.D.Ill.1959, 173 F.Supp. 416; and Textron Electronics, Inc. v. Unholtz-Dickie Corp. et al., D.C.Conn.1961, 193 F.Supp. 456, 459, the latest decision interpreting the term "principal place of business" in 28 U.S.C. § 1332(c).

In the actions before this Court, the plaintiff, at the moment of commencement of both suits, controlled and directed the activities of six wholly-owned subsidiaries from its executive offices in Mineola, New York. A similar situation was presented to the Court in Textron Electronics, Inc. v. Unholtz-Dickie Corp. et al., supra, where the plaintiff corporation was a holding-type company which owned and controlled several smaller, subsidiary, operating companies. Substantially all of the principal policy, financial, tax, accounting, internal auditing, insurance and other administrative functions were performed in Rhode Island. However, two manufacturing plants were located in California, with three additional plants situated in Connecticut, Iowa and Rhode Island. When the suit was filed, the corporation was in the process of acquiring additional subsidiary plants. The Court quoted from Scot Typewriter,

supra, and emphasized that the "place where 'all of its business was under the supreme direction and control of its officers'" was an important factor. Commenting on the effect of ownership of subsidiary companies which are controlled from executive offices of the parent company, the Court said:

"The defendants argue that the activities of subsidiaries cannot properly be considered as a part of the business carried on outside of the State of Connecticut. But it is certainly a part of the business of the plaintiff, as the parent corporation, to vote the shares of its wholly owned subsidiary and in so doing it must have a determining voice in establishing and overseeing its vital operations and functions. * * * Inclusion of a subsidiary's business as a part of the business of the parent corporation for the purpose of locating the parent's 'principal place of business' is no innovation as far as the Bankruptcy Act is concerned. * * *" (Citations omitted.)

Clearly, under these decisions applying the "nerve center" test, Lancer must be found to have maintained its principal place of business in Mineola, New York.

It is true that the significance placed by Courts upon the location of executive and administrative offices has been the subject of criticism as, for example, in Gilardi v. Atchison, Topeka & Santa Fe Ry. Co., D.C.N.D.Ill.1960, 189 F.Supp. 82, 88, where the Court stated: "To equate principal place of business to executive offices would not only do injustice to defendants, but would run the risk of creating a substitute fiction for the fiction of charter citizenship." There the Court looked to an "analysis of the totality of corporate activity" as the determining test. Similarly, in Kelly v. United States Steel Corp. et al., 3 Cir., 1960, 284 F.2d 850, 853, the Third Circuit disapproved, saying:

"The appellants urge upon us that the test should be where the 'nerve center' of the corporation's business is and they urge that the nerve center is New York. We do not find the figure of speech helpful. Dorland's Medical Dictionary tells us that a nerve center is 'any group of cells of gray nerve substance having a common function.' We think there will be, in the case of United States Steel Corporation, a good many collections of nerve cells serving the common function of making the corporate enterprise go.

"We turn, therefore, from a pleasant and alluring figure of speech to a consideration of the facts of the Steel Corporation's life. * * *"

There the Court found the corporation's principal place of business to be in the State where "day-to-day corporate activity and management" was performed, namely, Pennsylvania. The Court found that Pennsylvania had more productive capacity and employed more employees than any other State in which the corporation functioned. Management of the giant corporation was divided among several States with the principal policy decisions being made in Pennsylvania and New York.

■ In the case of Lancer Industries, Inc., however, this is not true. All executive management and control is centered in Mineola, New York, and productive capacity is spread over Mississippi, Louisiana, and California. The ruling in Kelly, supra, does not weaken our conclusion that the principal place of business of Lancer Industries, Inc., is in Mineola, New York.

Defendants, however, still seek to invoke this Court's jurisdiction under 28 U. S.C. § 1441(c), which provides:

"Whenever a *separate and independent claim or cause of action,* which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all [the] issues therein, or, in its discretion, may remand all matters not otherwise

within its original jurisdiction." (Emphasis added.)

The leading case interpreting the phrase "separate and independent claim or cause of action" is American Fire & Casualty Co. v. Finn, 1951, 341 U.S. 6, 71 S.Ct. 534, 538, 95 L.Ed. 702, where the Supreme Court of the United States concluded, from the previous history of "separable controversy," the broad meaning of "separate and independent * * * cause of action," and the congressional purpose in the statutory revision resulting in 28 U.S.C. § 1441(c), "that where there is a single wrong to plaintiff, for which relief is sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)." There the Court looked to State Court rules determining the separability of claims and joinder of parties in one suit where a single primary right of the plaintiff is invaded and relief is sought against several parties in one action.

Other Courts also have looked to State law in determining whether a cause of action is separate and independent from others alleged in a single suit. South Carolina Electric & Gas Co. v. Aetna Ins. Co., D.C.E.D.S.C.1953, 114 F.Supp. 79; Kornegay v. Hardware Mutual Fire Ins. Co., D.C.E.D.N.C.1952, 106 F.Supp. 347; Leonards Co. v. Ohio Insurance Co., D.C. S.D.Ohio 1960, 182 F.Supp. 340; Kolb v. The Prudential Insurance Co. of America, D.C.W.D.Ky.1959, 170 F.Supp. 97; State of Colorado ex rel. Land Acquisition Commission v. American Machine & Foundry Co., D.C.Colo.1956, 143 F. Supp. 703.

■ Where a plaintiff joins several defendants in one suit seeking recovery for a single wrong, for example, the failure to pay compensation for damage to or loss of property, there is not a separate and independent cause of action within the meaning of 28 U.S.C. § 1441(c). There is but a single wrongful invasion of the plaintiff's single primary right to receive indemnity or compensation for his loss.

An analysis of the claims against the insurers in suit number 8098 reveals that, according to plaintiff's petition, each insurance company issued a separate policy in which it undertook to insure plaintiff against the risk of business interruption and cessation of business operations caused by any number of occurrences, including fire. These several policies, each termed "Use and Occupancy Insurance" by plaintiff, apparently insured the plaintiff against the *same risk, namely, loss of profits because of business interruption.* The policies do not carry the same face amounts of coverage, according to the complaint, but it is significant that each of the twelve policies was issued in the month of June, 1960. Plaintiff's claim against each insurer is based on the *same loss,* that is, business interruption and damages in the amount of $1,590,-338.54 which resulted from and were caused by a fire of undetermined origin in plaintiff's manufacturing plant on July 6, 1960. Presumably, each insurer has the same defense, if any, to the claims of the plaintiff.

It is important, we think, to distinguish this case from the situation where insurance companies undertake to insure a person against *different risks,* for example, one company insuring against the risk of personal injury, and another against the risk of property damage. Several cases relied upon by the defendants are in this category and therein lies the reason that the Courts found "separate and independent" claims or causes of action. Breslerman v. American Liberty Ins. Co., D.C.S.D.N.Y.1959, 169 F.Supp. 531.

Two facts in this case connect and associate each claim with the other, namely, (1) each policy insured plaintiff against the *same risk,* and (2) each claim is predicated upon the *same loss* and cause thereof which allegedly gives rise to liability under the terms of the several policies.

■ In plaintiff's claim against the Merrill Agency, Inc., it seeks a declaration of liability with the Harbor Insurance Company, *in solido.* Under Louisiana joinder rules, debtors *in solido* may be

joined in a single suit where there exists a common interest in the subject matter of the suit or where the causes of action against each arise from the same common source. Reardon v. Dickinson, 1924, 156 La. 556, 100 So. 715; McGee v. Collins, 1924, 156 La. 291, 100 So. 430.

Perhaps the leading Louisiana decision on joinder of parties is Gill v. City of Lake Charles, 1907, 119 La. 17, 43 So. 897, where the Court laid down the requirement that all of the parties must have a "common interest" in the subject matter of the suit. Earlier Louisiana decisions had determined the propriety of the joinder by looking for a "community of interest," or "mutuality of interest" or "cognate origin." See Favrot v. Parish of East Baton Rouge, La.1878, 30 La.Ann. 606; State ex rel. Johnson v. State Tax Collector, 1887, 39 La.Ann. 530, 2 So. 59; Riggs v. Bell, 1887, 39 La.Ann. 1030, 3 So. 183; and McMahon, "The Joinder of Parties in Louisiana," 19 La. L.Rev. 1 (1958).

Several decisions have emphasized the trend of Louisiana jurisprudence to liberalize the rules of joinder thereby avoiding a multiplicity of suits. See Granier v. Bourgeois, 1 Cir. La.App.1939, 188 So. 423, and authorities cited therein. For an exhaustive list of Louisiana citations enunciating the "common interest" or "community interest" criterion, see Official Revision Comments following Art. 463, LSA–Code of Civil Procedure.

In actions such as these, it does not matter that the plaintiff charges the defendants with joint and several liability, or only several liability, or charges them with liability in the alternative. Rather, the identity of issues with respect to all of the parties and the necessity for the plaintiff, in order to obtain full recovery of its loss under the several policies, to make all the insurers defendants clearly reinforces the view that there is an interlocked series of transactions, and, thus, no separate and independent claim or cause of action within the meaning of 28 U.S.C. § 1441(c), and the reasoning in Finn, supra. See Board of Education of Marlboro Tp.,

Monmouth County v. Hartford Fire Ins. Co., D.C.N.J.1952, 105 F.Supp. 697; Leonards Co. v. Ohio Insurance Co., D.C. S.D.Ohio 1960, 182 F.Supp. 340; Chason Bros. v. Insurance Co. of North America, D.C.S.D.N.Y.1952, 102 F.Supp. 803; and Breslerman v. American Liberty Ins. Co., D.C.E.D.N.Y.1959, 169 F.Supp. 531, where the Court distinguished between insuring against the same risk and against different risks. Cf. Baltimore Gas & Electric Co. v. U. S. Fidelity & Guaranty Co., D.C.Md.1958, 159 F.Supp. 738.

In suit number 8099, plaintiff seeks indemnity in the total sum of $251,000 under several policies in which each insurer undertook to insure plaintiff against the risk of damage to or loss of machinery, equipment, tools, molds, and other business property. Plaintiff's claim against each insurer and the Merrill Agency, Inc., *in solido* with the Harbor Insurance Company, is predicated upon the *same loss* and cause thereof, namely, damage to business property resulting from the fire of July 6, 1960. As in the other action, each policy covered the *same risk* and, presumably, each insurer will have the same defenses to plaintiff's claims; the several policies were issued within a period of six months. In this suit, as noted, plaintiff also seeks to recover from the Merrill Agency, Inc., *in solido* with Harbor Insurance Company and, as in the other action, Louisiana rules of joinder apply to allow joinder of all parties with a "common interest" or "community of interests" in the subject matter of the suit. See Officer v. American Eagle Fire Ins. Co., 1 Cir. La.App.1932, 139 So. 719, overruled on unrelated grounds, 1932, 175 La. 581, 143 So. 500.

We conclude, therefore, that all parties defendant in these actions should be joined to effect a complete adjudication of the controversies and that each is a necessary party to the suit in which it is named. Necessary parties are those whose interests in the subject matter of the controversy are separable, and whose absence would not prevent the granting of the proper relief to the parties actually

joined, but who should be made parties, if their joinder is feasible, to avoid a multiplicity of actions and to effect a complete adjudication of the controversy. See McMahon, "The Joinder of Parties in Louisiana," 19 La.L.Rev. 1 (1958), Art. 642, LSA–Code of Civil Procedure.

Accordingly, we must hold that the claims in suits numbers 8098 and 8099 are not separate and independent, within the meaning of § 1441(c), and the motions to remand both cases to the State Court are hereby granted.